## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ************************************* | : | PROCEEDINGS FOR |
| IN RE: | : | REORGANIZATION UNDER |
|     BERNIE'S AUDIO VIDEO | : | |
|     TV APPLIANCE CO., INC. | : | |
| | : | CHAPTER 11 |
|         DEBTOR | : | |
| | : | |
| | : | CASE NO. |
| ************************************* | | |

**EMERGENCY MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDERS:  (I) AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AND (B) THE CONDUCT OF STORE CLOSING OR SIMILAR THEMED SALES; (II) AUTHORIZING THE DEBTOR TO ASSUME THE AGENCY AGREEMENT; (III) AUTHORIZING BONUS PAYMENTS; (IV) GRANTING A LIEN TO THE SALES AGENT; AND (V) GRANTING RELATED RELIEF**

TO:    THE HONORABLE ALBERT S. DABROWSKI
       CHIEF UNITED STATES BANKRUPTCY JUDGE

Bernie's Audio Video TV Appliance Co., Inc., the above-captioned debtor and debtor in possession (the "Debtor" or "Merchant"), hereby moves the court (the "Motion") on an emergency basis for the entry of an interim order and, upon the Final Hearing (as defined below), a final order (i) authorizing the Debtor to (A) sell substantially all of its assets free and clear of all liens, claims and encumbrances, and (B) conduct store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "Sale Guidelines") annexed as Exhibit 1 to the proposed interim (the "Interim Order") and final  orders (the "Approval Order," together with the Interim Order, the "Orders") accompanying this Motion; (ii) authorizing the assumption of the Agency Agreement dated as of January 13, 2010 (the "Agency Agreement") by and between the Debtor and Hilco Merchant Resources, LLC ("Hilco" or "Agent") a copy of which is annexed as Exhibit A hereto; (iii) authorizing the Debtor to pay, in its sole and absolute

discretion, Bonus Payments (as defined below); (iv) granting a lien to the Agent upon entry of the Approval Order; and (v) granting such other related relief as may be appropriate.  In support of this Motion, the Debtor respectfully states as follows:

1.      On January 14, 2010, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut.  The Debtor continues to operate its business pursuant to Bankruptcy Rules 1107 and 1108.

2.      The Debtor is a retailer of televisions, appliances, bedding, and related products in New England.  In particular, the Debtor sells merchandise in 15 stores in Connecticut, Massachusetts, and Rhode Island (the "Retail Stores").  All of the Retail stores, as well as the Debtor's corporate headquarters, are operated under leases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C.  §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory basis for the relief sought herein is section 363 of the Bankruptcy Code, and 2002 of the Federal Rules of Bankruptcy Procedure.  Venue of the debtor's chapter 11 case and its Motion in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.

4.      Prior to the Petition Date, the Debtor took significant steps to attempt to avoid the necessity of this proceeding.  However, the Debtor has experienced recurring losses on operations and is no longer able to sustain itself financially.  Specifically, in 2008, the Debtor lost $234,154 on $125,362,707 in sales, and in 2009, the Debtor lost $1,906,340 on $112,240,679 in sales.  The losses were a result of the decreased sales volume and a reduction of margin on sales.  As a result of the losses, the Debtor was in default of its obligation to its lender, RBS Citizens, N.A. (the "Lender" or "Citizens").  In December 2009, the Debtor engaged the

services of Altman & Company, LLC ("<u>Altman</u>") to serve as management consultants to the

Debtor to assess the financial viability of the Debtor going forward under various circumstances.

5.      The Debtor, in conjunction with Altman, investigated a number of reorganization

and liquidation alternatives, including reducing the number of stores and eliminating the Enfield

distribution center.  The Debtor also explored the sale of its business as a going concern without

success.

6.      After a review of its alternatives, the Debtor concluded that the best way to

maximize the value of the business for the benefit of creditors was to conduct an orderly

liquidation with the assistance of a professional liquidator, who would conduct the store closing

sales ("<u>Store Closing Sales</u>") at all of the Debtor's retail locations.  A list of the Debtor's

locations where Store Closings Sales will be held is attached hereto as <u>Exhibit C</u>.

7.      In order to expedite the selection of a liquidator and begin the liquidation process,

the Debtor interviewed several liquidation agents, so as to maximize value of the assets.

8.      Based on the bid submitted by Hilco, and with the advice of Altman and with the

consent of the Lender, the Debtor determined that entering into the Agency Agreement with

Hilco to conduct the Store Closing Sales according to the terms of the Agency Agreement and

Sale Guidelines (a copy of the Sales Guidelines is attached hereto as <u>Exhibit B</u>) was in its best

interest and the best interests of its stakeholders.

9.      Accordingly, effective as of January 13, 2010, the Debtor enter into the Agency

Agreement whereby Hilco agreed to serve as the Agent to the Debtor in connection with a

liquidation sale of Debtor's assets.  A copy of the Agency Agreement is attached hereto as

Exhibit A.

10.     While the Debtor respectfully refers the Court, creditors, and interested parties to the Agency Agreement in its entirety, the Debtor submits for reference only that the Agency Agreement essentially provides that Hilco will act as the Debtor's exclusive agent for the purpose of conducting Store Closing Sales at all of the Debtor's retail locations and disposing of the Debtor's inventory, furniture, fixtures, and equipment, free and clear of all liens, claims or encumbrances.

11.     Pursuant to the Agency Agreement, Hilco will advise the Debtor with respect to the sale of the Debtor's merchandise at their retail stores and distribution center (collectively, the "Merchandise") and certain furniture, fixtures, and equipment as set forth more fully below and in the Agency Agreement (the "FF&E," and, together with the Merchandise, the "Assets"). Hilco will be compensated from the sale proceeds following payment to the Debtor of the guaranteed amount of 80.3% (the "Guaranty Percentage") of the cost value of the merchandise, expenses of the sale, and certain other amounts payable to the Debtor (collectively, the "Guaranty Amount").

12.     The following briefly summarizes certain material provisions of the Agency Agreement and is qualified entirely by reference to the Agency Agreement attached hereto as Exhibit A:[1]

    (a)   <u>Services</u>.  Agent will serve as the Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of the Assets, in accordance with the terms and conditions of the Agency Agreement.

---

[1] The following description of the significant terms of the Agency Agreement is a summary of the terms of the Agency Agreement, which is attached as Exhibit A.  Capitalized terms used but not defined in this Motion shall have the meaning ascribed to them in the Agency Agreement.  This summary does not propose to contain all essential terms of the Agency Agreement or a complete description of each category of terms included.  To the extent that anything contained in this Motion differs in any way from the terms set forth in the Agency Agreement, the terms of the Agency Agreement shall control.

(b)   <u>Guaranteed Amount</u>.     Agent will guarantee to Merchant a minimum recovery of 80.3% of the Cost Value of the Merchandise conditioned upon entry of an Interim Order approving the assumption of the Agency Agreement in its entirety no later than January 15, 2010.  The Guaranty Percentage in the Agency Agreement was fixed based upon the aggregate cost value of the merchandise being not less than $13,200,000 and not more than $15,200,000.  To the extent that the aggregate cost value of the merchandise included in the sale is greater than $15,200,000 or less than $13,200,000, the Guaranty Percentage is subject to adjustment pursuant to the terms of the Agency Agreement.

(c)   <u>Compensation to Agent</u>.  As its compensation for services rendered to the Debtor, Agent shall be entitled to all Proceeds of the Sale after payment of the Guaranteed Amount, Expenses of the Sale, and all other amounts payable to the Debtor from Proceeds thereof.  Any Merchandise remaining after the Sale Termination Date shall become the property of Hilco, free and clear of all liens, claims, and encumbrances, and the proceeds received by Hilco from disposition of the unsold Merchandise shall be considered Proceeds of the Store Closing Sales.  As noted below, given the private sale nature of this transaction, the Agent has not sought any sort of breakup fee.

(d)   <u>Payment and Security</u>.     Not later than (one) 1 business day after the later of (i) the entry of an Approval Order; and (ii) execution of the Agency Agreement, Agent shall pay eighty (80%) of the Guaranteed Amount (the "Guaranteed Amount Deposit") (reduced by any amounts paid prior to the payment of the Guaranteed Amount Deposit) to the Merchant.  Agent shall pay the unpaid and undisputed balance of the Guaranteed Amount no later than the earlier of (i) the date that is thirty (30) days after the Sale Termination Date (in which case payment shall be of the undisputed portion of the balance of the Estimated Guaranteed Amount) and (ii) the second business day following the issuance of the audit report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service, after reconciliation and verification thereof by Agent and Merchant (the "<u>Inventory Report</u>").  To secure payment of the unpaid portion of the Guaranteed Amount from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable standby letter of credit, naming Citizens as beneficiary, in the original face amount equal to the unpaid portion of the Estimated Guaranteed Amount as of the Payment Date (as amended and in effect from time to time, the "<u>Agent Letter of Credit</u>") shall be issued by a bank selected by Agent and reasonably acceptable to Merchant and Lender Agent, and shall contain terms, provisions and conditions mutually acceptable to Merchant, Citizens, and Agent.  The "Lender Agent" shall mean RBS Citizens, National Association.

(e)   <u>Store Closing Expenses</u>.  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale which arise during the Sale Term limited to the expenses listed in Section 4.1 of the Agency Agreement.  Merchant funded an expense retainer to Agent in the amount of $375,000 ( the "<u>Retainer</u>") to secure payment of certain Expenses to be paid by Agent (supervision and advertising) prior to the assumption of this Agreement.

(f)    <u>Reconciliation</u>.  On each Wednesday during the Sale Term, commencing on the
second Wednesday after the Sale Commencement Date, Agent and Merchant shall
cooperate to jointly prepare a reconciliation of the weekly Proceeds of the Sale,
Expenses, and any other Sale related items that either party may reasonably request
(the "<u>Weekly Sales Reconciliations</u>").  Merchant and Agent shall provide Lender
Agent with a copy of such Weekly Sales Reconciliations.  Within thirty (30) days
after the Sale Termination Date, Agent and Merchant shall jointly prepare a final
reconciliation of the Sale, including (without limitation) a summary of Proceeds,
Expenses, and any other accounting required hereunder (the "<u>Final Reconciliation</u>")
and deliver the same to each other and to Lender Agent the written results of which
shall be certified by representatives of each of Merchant and Agent as a final
settlement of accounts between Merchant and Agent.  Within five (5) days of
completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant
shall pay to Agent, as the case may be, any and all amounts due the other pursuant
to the Final Reconciliation.  During the Sale Term, and until all of Agent's
obligations under this Agreement have been satisfied, Merchant and Agent shall
have reasonable access to Merchant's and Agent's records with respect to Proceeds
and Expenses to review and audit such records.  In the event that there is a dispute
with respect to the Final Reconciliation, such dispute shall be promptly (and in no
event later than the third business day following the request by either Merchant or
Agent) submitted to the Bankruptcy Court for a determination.  Merchant and Agent
hereby agree to submit to the jurisdiction of the Bankruptcy Court for such
determination.

(g)    <u>Excluded Goods</u>.  Merchant shall retain all responsibility for any goods not included
as "Merchandise."  If Merchant elects at the beginning of the Sale Term, Agent shall
accept goods not included as "Merchandise" hereunder for sale as "Merchant
Consignment Goods" at prices established by the Agent.  The Agent shall retain
20% of the sale price (less Sales Taxes) for all sales of Merchant Consignment
Goods, and Merchant shall receive 80% of the receipts in respect of such sales (less
Sales Taxes).  Merchant shall receive its share of the receipts of sales of Merchant
Consignment Goods on a weekly basis, immediately following the weekly Sale
reconciliation by Merchant and Agent.  If Merchant does not elect to have Agent
sell Excluded Defective Merchandise, then all such items will be removed by
Merchant from the Stores at its expense as soon as practicable after the Sale
Commencement Date.  Agent shall have no cost, expense or responsibility in
connection with any goods not included in Merchandise.

(h)    <u>Distribution Center Expenses</u>.  The actual costs and expenses, including use and
occupancy at the Debtor's Enfield Distribution Center (the "Distribution Center"),
transfer and delivery (ticketed in the ordinary course consistent with historic
practices), related to the processing, transfer and consolidation of Distribution
Center Merchandise from the Distribution Center to the Stores (collectively, the
"Distribution Center Expenses") shall be the obligation of the Merchant.  On or
prior to the Sale Commencement Date, after consulting with Merchant, Merchant
and Agent shall cooperate with each other and shall mutually agree upon a schedule
and allocation of the Distribution Center Merchandise to the Stores, which schedule

and allocation will be based upon an objective of having the Distribution Center Merchandise as allocated to be sent to the Stores shipped to the Stores prior to the Interim Receipt Deadline (the "Pre-Sale Allocation"). To the extent Agent requests that the Distribution Center remain open past a date that is twenty one (21) days after the Sale Commencement Date, Agent shall be responsible, as an Expense hereunder, for the expenses listed on Exhibit 5.6(i) of the Agency Agreement on a *per diem* basis for each day thereafter.

(i)   Delivery of Customer Ordered Goods.  Agent shall cooperate with Merchant to facilitate the delivery of merchandise previously sold to customers and under deposit.  Merchant shall retain responsibility for the processing and delivery of such merchandise to customers, including retaining responsibility for the costs and expenses of processing, handling and delivery of such goods.  Merchant agrees to give customers full credit for any deposits made prior to the Sale Commencement Date and any proceeds derived from Customer Ordered Merchandise shall belong to Merchant.  To the extent Merchant requests that an order be fulfilled from Merchandise, Merchant shall reimburse Agent for the full amount of the customer deposit in connection with the Weekly Sales Reconciliation and all Proceeds relating to such transaction shall belong to Agent.

(j)   Sale Term.  The Sale shall commence on the first day following the entry of the Interim Order, but no later than January 15, 2010 (the applicable date shall be referred to as the "Sale Commencement Date").  Agent shall complete the Sale at the Stores, and shall vacate all of the Store premises on or before February 28, 2010 (the "Sale Termination Date") unless the Sale is extended by mutual agreement of Agent and Merchant, provided that Agent may terminate the Sale at any retail store location upon five (5) days' notice (the "Vacate Notice") to Merchant (the end of such notice period, as to each such Store, as applicable, the "Vacate Date").  The period for the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."  Merchant shall cooperate with Agent to prepare for the start of the Sale, including preparation of systems to handle download discounts and managing delivery of DC Merchandise based on the Pre-Sale Allocation.

(k)   Vacating the Stores. At the conclusion of the Sale, Agent agrees to leave the Stores in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E.  Agent shall vacate the Stores on or before the Sale Termination Date, as provided for herein, at which time Agent shall surrender and deliver the Store premises and Store keys to Merchant.  Agent's obligations to pay all Occupancy Expenses for each Store subject to Vacate Notice shall continue until the applicable Vacate Date for such Store.  All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, etc.) shall be returned by Agent to Merchant or left at the Store at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or sold (e.g., FF&E).  Agent shall be responsible for all Occupancy Expenses (irrespective of any per diem cap on Occupancy Expenses) for a Store for which Merchant is or becomes obligated resulting from Agent's failure to timely vacate.

(l) <u>Gross Rings</u>. In the event that the Sale commences at any Store subject to Inventory Taking prior to the completion of the Inventory Taking at such Store, then for the period from the Sale Commencement Date for such Store until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("<u>Gross Rings</u>"), and (ii) cash reports of sales within such Store.  Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Cost Value and Retail Price of the Merchandise sold by SKU.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings shall be included in Merchandise using the Gross Rings method and, as soon as determinable, Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis (without taking into account any of Agent's point of sale discounts or point of sale markdowns) sold during the Gross Rings period.

(m) <u>Conduct of the Sale</u>.  Agent shall be permitted to conduct the Sale in accordance with the Sale Guidelines.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right, limited only by the Sale Guidelines:

    i.    to establish and implement advertising and promotion programs consistent with a "going out of business," "store closing", "sale on everything", "everything must go",  or similar theme (including, without limitation, by means of media advertising, A-frame, similar interior and exterior signs and banners, and use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order;

    ii.    to establish Store hours that are consistent with the terms of applicable leases, and local laws and regulations, including without limitation Sunday closing laws;

    iii.    except as otherwise expressly included in an Expense, to use without charge during the Sale Term all FF&E, advertising materials, computer hardware and software, existing supplies located at the Stores and Distribution Center, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores and Distribution Center (whether owned, leased, or licensed);

    iv.    to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale; <u>provided</u>, <u>however</u>, that in the event that Agent expressly requests Merchant to provide services other than those normally provided in liquidations such as this to the Stores and relating to the sale of Merchandise by Merchant, Agent shall be

responsible for the actual incremental cost of such services as an Expense.  Agent shall exercise due care and return to the Merchant immediately at the end of the sale all materials and supplies except materials and supplies expended; and

v.   to transfer Merchandise between and among the Stores, the costs of which shall be paid by Agent as an Expense of the Sale.

(n)   <u>Supplementation</u>.  Agent shall not supplement the Merchandise in the Sale, but shall be permitted to move Merchandise between the Stores.

(o)   <u>Terms of Sales to Customers</u>.  All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash and nationally recognized bank credit cards.  **Agent will accept Merchant's gift certificates and Store credits, issued by Merchant prior to the Sale Commencement Date, and honor other customer programs required by the Sale Guidelines**, including but not limited to all customer satisfaction programs for items purchased prior to the commencement of the Sale as authorized by the Bankruptcy Court (including, but not limited to, acceptance of gift certificates, honoring of customer deposits, and granting of refunds for items purchased prior to the commencement of the Sale), to the extent that such programs were in effect at the time the items were purchased by such customers, <u>provided</u> that Agent shall be reimbursed by Merchant in connection with the Sale reconciliation contemplated under Section 5.2 of the Agency Agreement hereof on a dollar for dollar basis for any such programs honored by Agent.

(p)   <u>Sales Taxes</u>.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf.

(q)   <u>Returns of Merchandise</u>.  Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("<u>Returned Merchandise</u>") in accordance with Merchant's past practices, during the first thirty (30) days of the Sale to the extent the applicable Store is open for business during such time period.

(r)   <u>Employee Matters</u>.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale prior to the Sale Commencement Date.

i.   <u>Payroll Matters</u>.  During the Sale Term, Merchant shall process the base payroll for all Retained Employees and any former employees and

temporary labor retained by Agent. Each Tuesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Merchant shall transfer, or to the extent that the Payment Date has passed, Agent shall transfer, to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, worker's compensation and benefits for such week which constitute Expenses hereunder.

ii.    <u>Employee Retention Bonuses</u>.  Agent shall have the right to elect to pay, as an Expense, retention bonuses (each a "<u>Retention Bonus</u>") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of 10% of base payroll, for all Retained Employees who do not voluntarily leave employment and are not terminated "for cause".  Subject only to limitation of 10% of base payroll, the actual amount to be paid shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within two (2) business days after the Sale Commencement Date.

(s)    <u>Security Interest</u>.  Agent will have, effective as of the Payment Date, a valid and perfected first priority security interest in and lien upon the Merchandise, Agent's disposition commission related to Owned FF&E, the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds to secure all obligations of Merchant to Agent hereunder, junior only to (a) an amount equal to the unpaid portion of the Guaranteed Amount and (b) any amount owed by Agent to Merchant for Expenses without the necessity of filing financing statements to perfect the security interests.  Merchant shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest.

**BASIS FOR RELIEF REQUESTED**

## I.    <u>Authorizing the Assumption of the Consulting Agreement</u>

13.    The Debtor believes that the Store Closing Sales to be conducted by Hilco pursuant to the Agency Agreement will maximize the value of the Debtor's assets and is in the best interests of all concerned.  Time is of the essence in assuming the Agency Agreement and commencing the Sale.

14.     In order for the Debtor to conclude the Store Closing Sales as quickly and efficiently as possible, and thereby minimize any unnecessary administrative expenses, including those expenses for rent and related costs in connection with the retail store locations, it is essential that the Debtor be permitted to continue performing pursuant to the Agency Agreement.

15.     Since early January 2010, Hilco has been preparing for the Store Closing Sales. As a result of the preparations, Hilco is familiar with the Debtor's operations in its stores and the Store Closing Sales to be conducted therein.  Moreover, Hilco has overseen similar store closing sales and best knows how to maximize the value to be obtained by the Debtor during the remainder of such sales.

16.     Moreover, as discussed above, with the assistance of its professionals, the Debtor engaged in extensive pre-petition marketing efforts prior to entering into the Agency Agreement with Hilco.  Notably, the Agency Agreement entered into exclusively with Hilco, does not provide for the imposition of a breakup or similar fee.  While Hilco ordinarily seeks a breakup fee for transactions such as this, given the private sale nature of this matter, Hilco has not sought a breakup fee.  Given this and based upon the substantial pre-petition marketing efforts and for the reasons set forth herein, the Debtor strongly believes that any alternative sale process would only serve to negatively impact recoveries to its creditors.

17.     Specifically, failure by the Debtor to continue performing pursuant to the Agency Agreement at this point would lead only to unnecessary delay and expense that would in turn disrupt the Debtor's liquidation efforts.  Among other things, the Debtor and its advisors would be compelled to devote valuable time and effort, at considerable expense to the Debtor and its estate, to locating new agents to conduct closing sales at these stores.  In addition, during any delay in approving the Agency Agreement, the Debtor will continue to lose substantial sums and

incur administrative expenses.  This would inevitably result in tremendous disruption to the

Debtor's operations and in all likelihood decrease the recover to the Debtor's estate from the

Store Closing Sales.

18.     In contrast to the harm that any failure to perform under the Agency Agreement

would undoubtedly cause the Debtor and it estate, the Debtor believes that it will receive

significant benefits from performing under the Agency Agreement and allowing the Store

Closing Sales to proceed under the guidance of the Agent, who is well-equipped and sufficiently

experienced to ensure a maximum recovery on the inventory sales occurring through the Store

Closing Sales.

19.     The assumption of the Agency Agreement is in the best interests of the Debtor's

estate.  "[A] bankruptcy court reviewing a trustee's or debtor-in-possessions' decision to assume

or reject an executory contract [pursuant to §365] should examine a contract and the surrounding

circumstances and apply its best business judgment to determine if it would be beneficial or

burdensome to the estate to assume it."  In re Wireless Data, Inc., 547 F.3d 484, 488 (2nd Cir.

2008).  In its business judgment, Debtor has determined that it is in the best interests of the

Debtor, its estate, and its creditors to assume the Agency Agreement.

20.     The Agency Agreement protects the public by providing for the honoring of pre-

petition gift cards, deposits, and other customer programs such as returns.

21.     For all of the above reasons, the Debtor believes that the relief sought herein is in

the best interests of the Debtor, its estate, its creditors, and other parties in interest, and

respectfully requests that the Court authorize the Debtor's continued performance under the

Agency Agreement, and authorize the Debtor and Agent to take any and all actions as may be

necessary or desirable to implement the Agency Agreement and each of the transactions

contemplated thereby, and for such other relief as may be appropriate.

## II.   Authorizing the Sale of the Assets and the Store Closing Sales

22.    To obtain court approval to use property under section 363(b) of the Bankruptcy

Code for a sale or lease of property outside of the ordinary course of business, the Debtor needs

only show "some articulated business justification."  See, e.g., In re Lionel Corp., 722 F.2d 1063,

1070-71 (2nd Cir. 1983); Stephens Indust., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986);

In re Martin, 91 F.3d 389, 395 (3rd Cir,. 1996).

23.    This Court has the authority to approve store closing sales similar to that proposed

by debtor when the debtor's proposed sale of its assets pursuant to section 363(b) of the

Bankruptcy Code represents a reasonable business judgment on the part of the debtor.

Disposition of a debtor's inventory pursuant to store closing and liquidation procedures like

those proposed is an accepted method for sale of assets in chapter 11 cases involving retail

debtors and is justified by the circumstances of this case.  See, e.g., In re: BHS&B Holdings

LLC, 2009 WL 4043073 at *1 (Bankr. S.D.N.Y. 2009); In re: Bradlees, 2005 WL 106794 at *2

(Bankr. S.D.N.Y. 2005); In re: Ames Department Stores, Inc., 136 B.R. 357 (Bank. S.D.N.Y.

1992) (holding that "going out of business" sales are an important part of "overriding federal

policy requiring a debtor to maximize estate assets."); In re Whitehall Jewelers Holdings, Inc.,

Ch. 11 Case NO. 08-11261 (Bankr. D. Del. Aug. 8, 2008); In re Goody's Family Clothing, Inc.,

Ch. 11 Case No. 08-11133 (Bankr. D. Del. June 13, 2008).

24.    As described above, sound business reasons exist to justify the continuation of the

Store Closing Sales immediately.  Based upon the results of their exhaustive analysis of the

Debtor's ongoing and future business prospects, the Debtor's management and team of financial

advisors have concluded that the Store Closing Sales in accordance with the procedures set forth

13

in the Agency Agreement and Sale Guidelines is the best method to maximize recoveries to the

estates and to stop the rapid deterioration of the Debtor's businesses.  Maximization of asset

value and preventing business deterioration are sound business purposes, warranting

authorization of the proposed Store Closing Sales.  Moreover, the Debtor submits that continued

performance under the Agency Agreement is a reasonable exercise of its business judgment.

25.     Among other things, a failure by the Debtor to continue performance under the

Agency Agreement will likely have negative implications for the Debtor's recovery on inventory

through the Store Closing Sales because the Agency Agreement provides a substantial

guaranteed return for the sale of the Debtor's Assets that will enable the Debtor to minimize risk

and maximize value.

26.     To facilitate the sale of the Assets and in accordance with the terms of the Agency

Agreement, the Debtor requests authorization to sell the Assets through the Store Closing Sales

on a final, "as is" basis, free and clear of all liens claims, encumbrances, mortgages, security

interests, conditional sales or title retention agreements, pledges, hypothecations, judgments or

claims of any kind or nature and other interests (including, without limitation, all "claims" within

the meaning of section 101(5) of the Bankruptcy Code) (collectively, the "Liens").  Pursuant to

Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under §363

"free and clear of any interest in such property of an entity other than the estate" if, among other

things, entities with interest in such property consent.  11 U.S.C. §363(b).

27.     Hilco would not have entered into the Agency Agreement and would not

consummate the transactions contemplated thereby if the Sale did not permit the transfer of

estate assets free and clear of any and all Liens, or if Hilco would, or in the future could, be

liable for any or all of such liens.

14

A.    <u>Approving Sale of Assets Free and Clear of All Encumbrances</u>

28.    The Debtor requests approval to sell the Assets on a final "as is" basis, free and clear of any and all liens, claims and encumbrances (collectively, the "<u>Liens</u>") in accordance with section 363(f) of the Bankruptcy Code with any Liens in such Assets attaching to the proceeds in the order or priority and with the same force, validity and effect they had with respect to the Assets prior to the sale.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f); <u>In re Dundee Equity Corp.</u>, 1992 WL 53743 (Bankr. S.D.N.Y. 1992) (noting that Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of have been met).

29.    The Debtor believes that the sale of the Assets pursuant to the terms of the Sale Guidelines will satisfy one or more of the section 363(f) requirements.  The Debtor's lender has consented to the Store Closing Sales and the sale of the assets.  Thus, the sale of the Assets, with respect to the lender's collateral is authorized pursuant to section 363(f)(2).  Second, as the obligations to the Debtor's lender or any other person which may assert a lien on or claim against

the property being sold, can be satisfied by the payment of money, the Assets can be sold free

and clear pursuant to 363(f)(5).

       B.    <u>Approving the Sale Guidelines in Connection with the Store Closing Sales</u>

      30.    As a necessary part of this process, the Debtor requests the authority to conduct

the Store Closing Sales in accordance with the customary Sale Guidelines and without

complying the applicable state and local laws, statutes, rules and/or ordinances governing store

closing, liquidation or "going out of business" sales, except for such laws, statutes, rules or

ordinances which are for the protection of the health and safety of the public and consumer

protection laws.  The Debtor intends to comply with the state and local health and safety laws

and consumer protection laws in conducting the Store Closing Sales.  However, many state and

local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting

period, time limits, and other procedures for store closing, liquidation, or similar sales.  To

eliminate the time, delay and expense associate with the administrative procedures necessary for

non-bankruptcy sales, the Debtor requests that the Court expressly authorize the Store Closing

Sales in accordance with the Sale Guidelines.  By virtue of 28 U.S.C. §1334, this Court has

exclusive jurisdiction over the Debtor's property wherever located.  In the context of bankruptcy

cases, therefore, since creditors receive notice of the proposed sale, as well an opportunity to be

heard in this Court, enforcement of such statues and regulations is redundant and unnecessary.

      31.    The Bankruptcy Code preempts state and local laws the conflict with its

underlying policies.  <u>See</u> <u>Belculfine v. Aloe (In re Shenango Group, Inc.)</u>, 186 B.R. 623, 628

(Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal

obligations pursuant to the bankruptcy code … [A] state statute cannot place burdens on them

where the result would contradict the priorities established by the federal bankruptcy code."),

aff'd, 112 F.3d 633 (3d Cir. 1997).

32.     Here, state and local licensing requirements, time limits or other restrictions on

liquidation sales would undermine the fundamental purpose of section 363(b) of the Bankruptcy

Code by placing constraints on the Debtor's ability to marshal and maximize the value of the

Assets.  Accordingly, authorizing the Store Closing Sales in accordance with the Sale Guidelines

without the delays and burdens associated with obtaining various state and local licenses,

observing state and local waiting periods or time limits, and/or satisfying any additional

requirements with respect to advertising and the like is necessary and appropriate.  Moreover, the

delays inherent in satisfying such requirements will no doubt force the Debtor into paying an

additional month of rent and overhead for each of the Store Locations, as well as foist significant

administrative expenses upon the Debtor to satisfy the requirements of the various states,

counties and municipalities in which the Debtor operates.

33.     It is also necessary that any action by any lessor or any federal, state or local

agency, department or governmental authority or any other entity to prevent, interfere with or

otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be

enjoined.  See Missouri v. U.S. Bankruptcy Court, 647 F.2d 768, 776 (8th Cir. 1981), cert.

denied, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing

liquidation of grain warehouses directly conflicted with bankruptcy court's control over property

of debtor's estate and therefore violated automatic stay).

34.     The requested waiver is narrowly tailored to facilitate the successful

consummation of the Store Closing Sales.  The Debtor does not seek a general waiver of all state

and local requirements, but only those that apply specifically to liquidation sales.  As noted

above, the Debtor fully intends to be bound by and comply with all General and Safety Laws.

      C.      <u>Approving Waiver of Any Lease Restrictions that May Negatively Impact the</u>
                <u>Debtor's Ability to Conduct the Store Closing Sales</u>

      35.     Because the Debtor regularly conducts "sales" at the Store Locations, the Debtor

does not believe that the Store Closing Sales should interfere with lease provisions that are

intended to protect the image of a shopping center, mall or other location or avoid disruption of

normal commerce.  Nonetheless, certain of the leases governing the premises of the Store

Locations (collectively, the "<u>Leases</u>") may contain provisions purporting to restrict or prohibit

the Debtor from conducting store closing, liquidation, or similar sales.  Such provisions have

been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on

a debtor's ability to properly administer its case and maximize the value of its assets under

section 363 of the Bankruptcy Code.  <u>See</u>, <u>e.g.</u>, <u>In re Ames Dep't Stores, Inc.</u>, 136 B.R. at 359

(holding that enforcement of such lease restrictions would "contravene overriding federal policy

requiring debtor to maximize estate assets…"); <u>In re R. H. Macy and Co., Inc.</u>, 170 B.R. 69, 73-

74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a

covenant to stay open because the debtor had a duty to maximize the value of the estate and the

debtor fulfilled this obligation by holding a store closing sale and closing the store); <u>In re Tobago</u>

<u>Bay Trading Co.</u>, 112 B.R. 463, 467-68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to

reorganize would be significantly impaired to the detriment of creditors if lease provisions

prohibiting a debtor from liquidating its inventory were enforced); <u>In re Lisbon Shops, Inc.</u>, 24

B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in

Chapter 11 case where debtor sought to conduct going-out-of-business sale).

36.    As such, to the extent that such provisions or restrictions exist in any of the
Leases for the Store Locations, such landlords may not interfere with or otherwise seek to restrict
the Debtor from conducting the Store Closing Sales.  Accordingly, the Debtor requests that the
Court authorize the Debtor to conduct the Store Closing Sales without interference by any
landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

37.    Bankruptcy courts have previously held restrictive lease provisions affecting store
closing sales in chapter 11 cases unenforceable.  See, e.g., In re Ames Dept. Stores, Inc.
136 B.R. 357, 359 (Bankr. S.D.N.Y., 1992) ("This Court believes that to enforce the anti-GOB
sale clause of the Lease would contravene overriding federal policy requiring Debtor to
maximize estate assets by imposing additional constraints never envisioned by Congress."); In re
Three A's Holdings, L.L.C., Ch. 11 Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006)
(order authorizing, among other things, agent to conduct store closing sales).

38.    The Sale Guidelines are substantially similar to sale guidelines approved in
connection with store closing sales approved by other bankruptcy courts.  See, e.g., In re
Whitehall Jewelers Holdings, Inc., Ch. 11 Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8,
2008) (approving store closing sales pursuant to sale guidelines); In re Goody's Family Clothing,
Inc., Ch. 11 Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens
Holding Co., Ch. 11 Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); and In re
Sharper Image Corp., Ch. 11 Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (same).
The Sale Guidelines, like the sale guidelines approved in the cases cited herein, provide the
appropriate protections to any legitimate concerns that landlords might otherwise have
concerning the conduct of the Store Closing Sales.  Accordingly, for the reasons set forth above,
the Debtor believes that the conduct of the Store Closing Sales pursuant to the terms of the Sale

Guidelines is the most efficient means of preserving and maximizing the value of the Assets for the benefit of their stakeholders.

III.     Authorizing Payment of Bonus Payments

39.     Hilco will have the right to elect to pay, as an expense paid by Hilco, retention bonuses (the "Bonus Payments") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of 10% of base payroll, for all Retained Employees who do not voluntarily leave employment and are not terminated "for cause". Subject only to limitation of 10% of base payroll, the actual amount to be paid shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within two (2) business days after the Sale Commencement Date.

40.     The Bonus Payments.  Section 363(c) of the Bankruptcy Code permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c).  In the retail industry, it is ordinary course to pay store closing bonuses for employees making substantial contributions to a company's liquidation efforts.  Additionally, the Debtor believes that making the Bonus Payments will not subject any of its creditors to an unusual risk because the Bonus Payments will only be made to employees making a significant contribution to the Store Closing Sales and who, therefore, provide value to the estate in excess of what would otherwise be obtained.  The Debtor believes that making the proposed Bonus Payments to employees meeting this criteria, in the Debtor's sole discretion, constitutes an ordinary course transaction for which no Court approval is needed.

41.     Even if this Court finds that the bonuses do not constitute an ordinary course business practice within the scope of section 363(c) of the Bankruptcy Code, this Court also has

authority, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to authorize the Debtor

to make Bonus Payments.  Under section 105(a) of the Bankruptcy Code, the Court has

expansive equitable powers to fashion any order or decree that is in the interest of preserving or

protecting the value of a debtor's assets.  See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir.

1986) (stating that "[s]ection 105 sets out the power of the bankruptcy court to fashion orders as

necessary pursuant to the purposes of the Bankruptcy Code").  Similarly, the payment of bonuses

outside of the ordinary course of business should be approved when there is a sound business

purpose that justifies such action.  See In re Martin, 91 F.3d at 395; In re Montgomery Ward

Holding Corp., 242 B.R. at 153.  Making the Bonus Payment in connection with the Store

Closing Sales will accomplish a sound business purpose and aid in maximizing the value of the

Debtor's estate for the benefit of its stakeholders by inducing employees who are needed to

manage and complete the Store Closing Sale process to remain in the employ of the Debtor and

to give the effort needed to maximize the return from such sales.

42.    The Debtor submits that the Bonus Payments reflect an exercise of sound business

judgment, and will generate significant value to the estate in excess of the amount of the

payments themselves.  Moreover, the Debtor believes that the proposed Bonus Payments will

serve as the proper incentive to accomplish the twin goals of this case:  to minimize

administrative costs, and to maximize asset value—the combination of which will inure to the

benefit of the Debtor's creditors.  Accordingly, the Debtor submits that authorizing the Bonus

Payments on the terms set forth herein should be approved pursuant to section 363(b).

43.    The Debtor also submits that the Bonus Payments are not prohibited under section

503(c)(3)[2] of the Bankruptcy Code because the Bonus Payments are justified by the "facts and

---

[2]    Because the Bonus Payments are not (i) retentive in nature or (ii) severance payments, sections
503(c)(1) and (2), respectively, do not apply.  See 11 U.S.C. § 503(c).

21

circumstances" of this case.  Since courts have begun to analyze various payments under section 503(c)(3), they have been unanimous in holding that they must use the "business *judgment*" standard as the proper standard for determining whether bonus/incentive programs and the payments thereunder are justified.  See, e.g., In re Werner Holding Co. (DE). Inc., Case No. 06-10578 (Carey, J.) (Bankr. D. Del. July 20, 2006, August 22, 2006, and December 20, 2006); In re Nobex Corporation, No. 05-20050 (Walrath, C.J.) (Bankr. D. Del. May 15, 2006 and Dec. 21, 2005); In re Riverstone Networks. Inc., No. 06-10110 (Sontchi, J.) (Bankr. D. Del. March 28, 2006); In re Pliant Corporation, No. 06-100001 (Walrath, C.J.) (Bankr. D. Del. March 14, 2006). Indeed, in the Nobex case, the Court stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as clear, for any other transfers or obligations outside the ordinary course of business.... I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside the ordinary course of business are those that are justified by the facts and circumstances of the case.... I find it quite frankly nothing more than a reiteration of the standard under 363 ... under which courts had previously authorized transfers outside the ordinary course of business and that [are], based on the business judgment of the debtor....

In re Nobex Corp., Case No. 05-20050 (Walrath, C.J.) (Bankr. D. Del. January 12, 2006, Hearing Tr. at 86-87) (order approving the management Plan at issue entered January 20, 2006).

44.    No prior application for the relief requested herein has been made to this or any other court.

### REQUEST FOR WAIVER OF STAY

45.    The Debtor requests a waiver of any stay of the effectiveness of the Approval Order approving the relief requested in this Motion.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Given the harm to the estate if the Debtor cannot conduct these sales immediately upon approval of the Motion and complete such

sales prior to the end of February 2010, as anticipated, the Debtor believes it is in its best interest
to commence the Store Closing Sales on or before January 15, 2010.  Accordingly, the Debtor
submits that more than ample cause exists to justify a waiver of the ten-day stay imposed by
Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

## NOTICE

46.    Notice of this Motion will be provided to: (a) the United States Trustee; (b)  the
Debtor's twenty largest unsecured creditors (c) counsel to RBS Citizens, National Association
the Debtor's secured lender; (d) the Internal Revenue Service, Special Procedures Office; (e) the
State of Connecticut; (f) the State of Massachusetts; (g) the State of Rhode Island; (h) the
landlords of the closing stores; (i) any parties who have filed financing statements against the
Debtor; and (i) any party that has appeared and requested notice.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter orders substantially
in the form annexed hereto: (i) authorizing the Debtor to (A) sell substantially all of its assets
free and clear of all liens, claims and encumbrances, and (B) conduct store closing or similar
themed sales in accordance with the terms of the store closing sale guidelines (the "Sale
Guidelines") annexed as Exhibit 1 to the Orders; (ii) authorizing the assumption of the Agency
Agreement by and between the Debtor and Hilco a copy of which is annexed as Exhibit A
hereto; (iii) authorizing the Debtor to pay, in its sole and absolute discretion, Bonus Payments;
(iv) granting a lien to the Agent upon entry of the Approval Order; and (v) granting such other
related relief as may be appropriate.

23

Dated at Hartford, Connecticut, this 14th day of January, 2010.

Bernie's Audio Video
TV Appliance Co., Inc.

By: _____/s/ Barry S. Feigenbaum_____
        Barry S. Feigenbaum
        Fed. Bar No. ct06605
        Matthew T. Wax-Krell
        Fed Bar. No. ct26905
        Rogin Nassau LLC
        Its Attorneys

**Exhibit A**

1